UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| JOHN DELANEY, Guardian Ad Litem and Special Limited Conservator of ANDY R. DAVIS, a Protected Person; SHANNON HUMANN DAVIS, Individually, and as Guardian Ad Litem of KKD, minor child; and DESTYN HUMANN, <br><br>        Plaintiffs, <br><br>    vs. <br><br> RAPID RESPONSE, INC.; MARK A. DEPROW; AND RAPID RESPONSE 1, LLC, <br><br>        Defendants. | CIV. 12-5076-JLV <br><br><br> ORDER |

## INTRODUCTION

Plaintiffs John Delaney, guardian ad litem and special limited conservator of Andy R. Davis, a protected person, Shannon Humann Davis, individually, and as guardian ad litem of KKD, minor child, and Destyn Humann (hereinafter all plaintiffs are referenced collectively as "Mr. Davis") bring this diversity action alleging negligence causing personal injury and seeking compensatory damages plus prejudgment interest and disbursements from Rapid Response Inc., Rapid Response 1, LLC and Mark A. DeProw.   (Docket 36).   Mr. Davis alleges that Rapid Response, Inc., Rapid Response 1, LLC and Mark DeProw are liable for injuries suffered by Andy

Davis as a result of a motorcycle accident caused by Mr. DeProw's negligence. Id.   Defendants deny Mr. DeProw acted negligently and deny any liability for the injuries suffered by plaintiffs.   See Docket 41.   On January 14, 2014, this court entered an order granting Mr. Davis' motion for partial summary judgment against Rapid Response, Inc. on the issues of liability and causation.[1]   (Docket 31).   On July 18, 2014, Mr. Davis filed a motion for partial summary judgment against Rapid Response 1, LLC on the issues of liability and causation.   (Docket 51).   Rapid Response 1, LLC did not respond to Mr. Davis' motion for partial summary judgment.

## FACTS

Having reviewed Mr. Davis' statement of material facts in conjunction with the submitted affidavits, the court finds Mr. Davis' statement provides an accurate portrayal of the events and circumstances surrounding Mr. Davis' claim.   See Dockets 23, 26, 52, 54, 55.   Defendants failed to respond to Mr. Davis' statement of material facts and have waived any objections to plaintiffs' statement of material facts.   Pursuant to Federal Rule of Civil Procedure 56(e)(2), defendants' failure to controvert Mr. Davis' statement of undisputed material facts means those facts are admitted for purposes of the case.   See also D.S.D. Civ. LR 56.1D.   The court incorporates Mr. Davis'

---

[1]On January 9, 2014, Mr. Davis filed a joint stipulation indicating the defendants did not object to the motion.

statement of material facts by reference.   (Dockets 23 & 52).   A brief description of material facts follows.

On July 24, 2012, Mark DeProw was operating a semi-tractor and trailer traveling westbound on Highway 212.   He was looking for American Colloid to pick up a cargo load for his employer, Rapid Response Inc.   (Docket 23 at ¶ 1-2). At the location of the accident, Highway 212 consisted of two westbound lanes, a turning lane and one eastbound lane.   Id. at ¶ 3.   Mr. DeProw was traveling in the far right-hand lane closest to the north curb.   Id. at ¶ 2.   Mr. DeProw made a "U-turn" from the far right-hand lane.   Id. at ¶ 4.   Mr. DeProw's semi-tractor and trailer ("semi") blocked all lanes of travel on Highway 212 while he completed the U-turn.   Id. at ¶ 8.

Matthew Hoffman was operating a service truck traveling westbound on Highway 212.   Id. at ¶ 5.   Mr. Hoffman was behind Mr. DeProw at the time he made the U-turn.   Id.   Andy Davis was operating a motorcycle traveling westbound on Highway 212.   Id. at ¶ 6.   Andy was initially behind Mr. Hoffman's service truck.   Id.   At approximately the same time Mr. DeProw made the U-turn, Andy changed lanes from the right-hand lane to the left-hand lane in an attempt to pass Mr. Hoffman.   Id. at ¶ 7.   With Mr. Hoffman's service truck on his right and Mr. DeProw's semi directly ahead occupying all the traffic lanes, Andy had nowhere to go and could not avoid a collision.   Id. at ¶ 9.   Andy and his motorcycle slid down the turning lane of Highway 212 and passed

beneath Mr. DeProw's trailer.   Id. at ¶ 10.   A witness heard Andy strike his head during the collision.   Id. at 15.

Andy was operating his motorcycle within the posted 45-mile-per-hour speed limit.   Id. at 11.   The South Dakota Highway Patrol cited Mr. DeProw for making a prohibited U-turn in violation of SDCL § 32-26-25.   Id. at 12.   Mr. DeProw later pled guilty to making a prohibited U-turn.   Id.   As a result of the accident, Andy sustained a traumatic brain injury, including: a bilateral frontal lobe cerebral contusion, subarachnoid hemorrhage, and subdural hematoma and encephalopathy.   (Dockets 23 at ¶ 20, 52 at ¶ 44).

Rapid Response 1, LLC leased the semi from Rapid Response, Inc. (Docket 54-4 at p. 7).[2]   The lease provided Rapid Response 1, LLC with exclusive possession, control and use of the semi being driven by Mr. DeProw.   Id. at 8-9. However, Rapid Response 1, LLC allowed Rapid Response, Inc. to continue to use the semi.   Id.   Rapid Response 1, LLC placed no limitations on Rapid Response, Inc.'s usage and control over the semi.   Id.   Rapid Response, Inc. also had complete authority to supervise the drivers of Rapid Response 1, LLC, which included Mr. DeProw.   Id. at 4-5.   The semi driven by Mr. DeProw displayed a placard containing Rapid Response 1, LLC's United States Department of Transportation ("USDOT") identification number of 1643875.   (Dockets 54-4 at p. 5; 55).

---

[2]All page numbers refer to the page numbering assigned by the court's online docket, CM/ECF.

Further recitation of salient facts is included in the discussion section of this order.

## DISCUSSION

The court considers Mr. Davis' motion for partial summary judgment on the issues of liability and causation.

**A.**     **Standard Applicable to Summary Judgment Motions**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.   See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).   Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings but must set forth specific facts, by affidavit or other evidence, showing that a

5

genuine issue of material fact exists.   See Anderson, 477 U.S. at 256; Fed. R.

Civ. P. 56(e) (each party must support its own assertions of fact and address the

opposing party's assertions of fact as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for

purposes of a motion for summary judgment.   Anderson, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment.   Factual

disputes that are irrelevant or unnecessary will not be counted."   Id. (citing 10A

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and

Procedure § 2725, at 93-95 (3d ed. 1983)).   "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact."   Id. at 247-48 (emphasis in original).

Essentially, the availability of summary judgment turns on whether a jury

question is presented: "The inquiry performed is the threshold inquiry of

determining whether there is the need for a trial—whether, in other words, there

are any genuine factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party." Id. at 250.

**1.   Applicability of South Dakota Law**

" 'It is, of course well-settled that in a suit based on diversity of citizenship

jurisdiction the federal courts apply federal law as to matters of procedure but

the substantive law of the relevant state.' "   Jacobs ex rel. Jacobs v. Evangelical

6

Lutheran Good Samaritan Soc'y, 849 F. Supp. 2d 893, 896-97 (D.S.D. 2012)
(quoting Hiatt v. Mazda Motor Corp., 75 F.3d 1252, 1255 (8th Cir. 1996) (citing
Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938))).   "In a choice-of-law analysis for
a diversity action brought in federal district court, the choice-of-law rules are
substantive for Erie purposes, and the choice-of-law rules of the forum state are
applied to determine the litigating parties' rights."   Id. at 897 (citing Allianz Ins.
Co. v. Sanftleben, 454 F.3d 853, 855 (8th Cir. 2006).   The court applies South
Dakota choice-of-law rules.

       As of 1992 and continuing through the filing of this suit, the State of South
Dakota has used the most significant relationship approach to govern
multi-state tort conflicts.   Chambers v. Dakotah Charter, Inc., 488 N.W.2d 63,
67 (S.D. 1992).   Under the most significant relationship approach:

   (1)   The rights and liabilities of the parties with respect to an issue
         in tort are determined by the local law of the state which, with
         respect to that issue, has the most significant relationship to
         the occurrence and the parties   under the principles stated   in
         § 6.

   (2)   Contacts to be taken into account in applying the   principles of
         § 6 to determine the law applicable to an issue include:

         (a)   the place where the injury occurred,

         (b)   the place where the conduct causing the injury occurred,

         (c)   the domicile, residence, nationality, place of incorporation
               and place of business of the parties, and

         (d)   the place where the relationship, if any, between the
               parties is centered.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Id. at 68 (quoting Restatement (Second) of Conflicts of Laws § 145 (1971)).   The principles to be considered under section 6 are:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include[:]

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Id. (quoting Restatement (Second) of Conflict of Laws § 6 (1971)).   The court applies both sections 145 and 6 to the facts of this case.

Mr. Davis asserts this court is vested with diversity of citizenship subject matter jurisdiction to adjudicate his claim under 28 U.S.C. § 1332.   (Docket 36 at ¶ 1).   Defendants have not objected to the plaintiff's jurisdictional assertion. The court finds that South Dakota law supplies the substantive law governing this case.   Mr. Davis crashed his motorcycle after taking evasive action to avoid

a collision with Mr. DeProw's semi near Belle Fourche, South Dakota.   (Docket 23 at ¶¶ 1-2).   Mr. DeProw was attempting to complete a prohibited U-turn.   Id. at ¶ 12.   Mr. DeProw pled guilty to the charge of making an illegal U-turn in violation of SDCL § 32-26-25.   Id. at ¶ 13.   Thus, Mr. Davis' injury, Mr. DeProw's conduct and the parties' relationship with one another are all based in South Dakota.   The only factor weighing in favor of applying substantive law other than that of South Dakota is that Rapid Response, Inc. is a Missouri Corporation with its principal place of business in Missouri.   (Dockets 36 at ¶ 4, 41 at ¶ 1).   Sections 6 and 145 militate in favor of the court applying South Dakota substantive law to the facts of this case.

### 2. Defendants Admit Mr. DeProw's Negligence Was a Proximate Cause of Andy Davis' Injuries

By failing to controvert Mr. Davis' undisputed statement of material facts, defendants admit "the negligence of Mark A. DeProw committed in the course and scope of his authority as an agent of Rapid Response, Inc., was a proximate cause of the traumatic brain injury sustained by Andy Davis on July 24, 2012." (Docket 23 ¶ 23 as to Rapid Response, Inc.).   Mr. Davis' statement of undisputed material facts incorporates these same facts as to Rapid Response 1, LLC. (Docket 52 at p. 1).   Mr. Davis' assertions of negligence and causation are admitted by Rapid Response 1, LLC pursuant to Fed. R. Civ. P. 56(e)(2) and D.S.D. Civ. LR 56.1D.   The record developed by Mr. Davis fully supports the granting of partial summary judgment on the issues of negligence and causation as to Rapid Response 1, LLC.

9

"[Ordinarily] questions of negligence and contributory negligence are for the jury in all but the rarest cases."   Robbins v. Buntrock, 550 N.W.2d 422, 427 (S.D. 1996) (citing Nelson v. Nelson Cattle Co., 513 N.W.2d 900, 903 (S.D.1994)). However, under South Dakota law, "[t]he violation of a statute enacted to promote safety constitutes negligence *per se.*"   Engel v. Stock, 225 N.W.2d 872, 873 (S.D. 1975) (emphasis added).

The South Dakota Supreme Court has a long history of finding negligence *per se* after a person has violated a traffic law.   See Engel, 225 N.W.2d at 873; Albers v. Ottenbacher, 116 N.W.2d 529, 530-32 (S.D. 1962) (holding that a defendant who operated his car in violation of a South Dakota statute regulating the brakes of motor vehicles (SDC § 44.0346) was guilty of negligence as a matter of law); Grob v. Hahn, 122 N.W.2d 460, 462 (S.D. 1963) (The Court granted a defendant's motion for a directed verdict while holding the plaintiff was negligent in attempting to pass the defendant's vehicle.); Treib v. Kern, 513 N.W.2d 908, 912-913 (S.D. 1994) (finding that a violation of SDCL § 32-26-14 (entry of highway from alley, building, or private road) and § 32-30-20 (unsafe backing prohibited) constituted negligence *per se*).

In this case, Mr. DeProw was charged with and pled guilty to making a prohibited U-turn in violation of SDCL § 32-26-25.   (Docket 26-3 at pp. 3-4). Mr. Davis would not have crashed his motorcycle and sustained his traumatic brain injury had Mr. DeProw not made the prohibited U-turn.   See *infra* Part 2.b.   The court finds Mr. DeProw's prohibited U-turn, a violation of SDCL

10

§ 32-26-25, constitutes negligence *per se*.   Based on the record, the court finds

Mr. DeProw's negligence was the legal cause of Andy Davis' injuries.

### 3.   Rapid Response 1, LLC Can Be Held Liable For Mr. DeProw's Negligent Acts[3]

At the time of the July 24, 2012, incident, Mr. DeProw was acting as an

agent of Rapid Response 1, LLC and, as a result, Rapid Response 1, LLC can be

held liable for injuries caused by Mr. DeProw's negligent actions which occurred

within the scope of his employment.   As an initial matter, Rapid Response 1,

LLC and Mr. DeProw satisfy the statutory and regulatory definitions of

"employer" and "employee," respectively.   Compare 49 U.S.C. § 31132(3)(A) (An

" 'employer' means a person engaged in a business affecting interstate commerce

that owns or leases a commercial motor vehicle in connection with that business,

or assigns an employee to operate it . . . ."), with Docket 54-4 at pp. 5, 7-8; and

compare 49 U.S.C. § 31132(2)(A) (An " 'employee' means an operator of a

commercial motor vehicle (including an independent contractor when operating

a commercial motor vehicle) . . . who directly affects commercial motor vehicle

safety in the course of employment . . . ."), with Docket 54-4 at p. 4.[4]   The federal

motor carrier safety regulations apply to the actions of both parties.

---

[3]This court granted Mr. Davis' motion for partial summary judgment against Rapid Response, Inc. on the issues of liability and causation.   (Docket 31).

[4]The court notes Rapid Response 1, LLC and Mr. DeProw also meet the regulatory definition of "employer" and "employee" as defined in 49 C.F.R. § 390.5.

Section 376.12(c)(1), formerly § 1057.12(c)(1), of the federal motor carrier safety regulations provides:

> The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease.  The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

49 C.F.R. § 376.12(c)(1).

Prior to 1992, the majority view among courts interpreting § 1057.12(c)(1) was to impose strict liability on lessee-carriers for the negligence of owner-operators.  Bays v. Summitt Trucking, LLC, 691 F. Supp. 2d 725, 730 (W.D. Ky. 2010) (citing Price v. Westmoreland, 727 F.2d 494, 495 (5th Cir. 1984); Rodriguez v. Ager, 705 F.2d 1229, 1237 (10th Cir. 1983); Wellman v. Liberty Mut. Ins. Co., 496 F.2d 131, 136 (8th Cir. 1974); Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc., 289 F.2d 473, 478 (3d Cir. 1961)); see also Grinnell Mut. Reinsurance Co. v. Empire Ins. Co., 722 F.2d 1400, 1404 (8th Cir. 1983); Acceptance Ins. Co. v. Canter, 927 F.2d 1026, 1027 (8th Cir. 1991).

Many courts characterized the strict liability called for by § 1057.12(c)(1) as an "irrebutable presumption" of an employment relationship between the carrier-lessee and the driver of a vehicle displaying an Interstate Commerce Commission ("ICC") placard of the carrier-lessee.  UPS Ground Freight, Inc. v. Farran, 990 F. Supp. 2d 848, 856 (S.D. Ohio 2014) (citations omitted).  The presumption of employment became known as "statutory employment."  Id. (citations omitted).  This pre-1992 interpretation of § 1057.12(c)(1) resulted in

12

courts holding a carrier-lessee liable, as a matter of law, for the negligent acts of the driver if the lease was still in effect and the vehicle displayed the carrier-lessee's ICC placard.   Id.

This interpretation of § 1057.12(c)(1) became colloquially known as the "logo liability" doctrine and was adopted by the Eighth Circuit and others.   See Occidental Fire & Cas. Co. of N.C. v. Soczynski, Civil No. 11-2412 (JRT/JSM), 2013 WL 101877, at *8-9 (D. Minn. Jan. 8, 2013), aff'd sub nom. Occidental Fire & Cas. Co. v. Soczynski, 765 F.3d 931 (8th Cir. 2014); see also Wellman, 496 F.2d at 136; Grinnell Mut. Reinsurance Co., 722 F.2d at 1404; Acceptance Ins. Co., 927 F.2d at 1027; Rodriguez v. Ager, 705 F.2d 1229, 1231, 1236 (10th Cir. 1983).   However, as will be discussed later, "the continued vitality of the logo liability doctrine remains unclear, and courts have struggled with apportioning liability" following the 1992 amendments.   Occidental Fire & Cas. Co. of N. C., 2013 WL 101877, at *8.

Prior to the 1992 amendments, only a minority of courts interpreting the ICC regulations read § 1057.12(c)(1) as "creating . . . a rebuttable presumption of an employment relationship between the driver and the carrier-lessee."   UPS Ground Freight, Inc., 990 F. Supp. 2d at 856.

In 1992, 49 C.F.R. § 376.12 was amended, specifically § (c)(4) was added, which provided in pertinent part:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized

13

> carrier lessee. An independent contractor relationship may exist
> when a carrier lessee complies with 49 U.S.C. 14102 and attendant
> administrative requirements.

49 C.F.R. § 376.12(c)(4).

Even prior to the addition of § (c)(4), the ICC stated it "did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will produce appropriate results." *Ex Parte* No. MC-43 (SUB–NO 16), Lease & Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d 92, 93 (I.C.C. Oct. 10, 1986).

The ICC made clear the 1992 addition of section (c)(4) was meant to reaffirm the neutrality of § (c)(1) when determining the liability obligations of a carrier-lessee. See Petition to Amend Lease & Interchange of Vehicle Regulations, 8 I.C.C.2d 669, 671 (I.C.C. June 29, 1992). The ICC stated section 376.12 did "not affect 'employment status.'" Id.; see also UPS Ground Freight, Inc., 990 F. Supp. 2d at 857-58. Because the ICC is an administrative agency, its interpretation of its own regulation is entitled to deference. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945) ("[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.").

Following the 1992 amendments to the federal motor carrier safety regulations, courts interpreting § 376.12(c) generally agreed the regulations

14

create only a rebuttable presumption of an agency relationship between the lessee-carrier and the driver.   See, e.g., Bays, 691 F. Supp. 2d at 730-32 (holding that § 376.12 created a rebuttable presumption of agency between a lessee-carrier and a driver); Thomas v. Johnson Agri-Trucking, 802 F. Supp. 2d 1242, 1249 (D. Kan. 2011) (Section 376.12 "creates only a rebuttable presumption of agency."); UPS Ground Freight, Inc., 990 F. Supp. 2d at 857-60 (concluding that § 376.12 created a rebuttable presumption of an agency relationship between the carrier-lessee and the driver.); see also Penn v. Virginia Int'l Terminals, Inc., 819 F. Supp. 514, 523 (E.D. Va. 1993) (Interpretations of § 376.12(c), and its predecessor 1057.12(c), made prior to the addition of § (c)(4) result in "a misinterpretation of the regulation, especially with the hindsight provided by the 1992 amendment[.]"); but see Zamalloa v. Hart, 31 F.3d 911, 917 (9th Cir. 1994) ("The parties agree that compliance with [§ 376.12] creates an irrebuttable presumption of an employment relationship sufficient to establish the carrier's liability . . . .").

The interpretation that § 376.12(c)(1) creates a rebuttable presumption of an agency relationship is confirmed by the legislative history supporting Congress' 1956 amendment of the Interstate Common Carrier Act.   Bays, 691 F. Supp. 2d at 731.   Congress amended the Interstate Common Carrier Act "to protect the public from the tortious conduct of the often judgment-proof truck-lessor operators . . . [by] . . . requir[ing] interstate motor carriers to assume full direction and control of the vehicles as if they were the owners of such vehicles."   Id. (citations and internal quotation marks omitted).   The

15

application of a rebuttable presumption standard under § 376.12(c) both adheres to the ICC's "neutrality" objective regarding state agency, tort and contract law, and also thwarts any attempts by a carrier to lease equipment from unregulated independent contractors by presuming an agency relationship between the common carrier-lessee and the lessor/driver.   Id.

Nonetheless, the Eighth Circuit, in dicta, indicated the continued vitality of strict liability underlying the logo liability doctrine as espoused in Mellon Nat'l Bank & Trust Co., Grinnell Mut. Reinsurance Co., Wellman and Acceptance Ins. Co., *supra*, even though those cases were decided prior to the 1992 amendments to § 379.12(c).   Huggins v. FedEx Ground Package Sys., Inc., 592 F.3d 853, 862 (8th Cir. 2010); see also Occidental Fire & Cas. Co. of N. Carolina, 2013 WL 101877, at *8.

The court finds it unnecessary to determine whether the irrebutable presumption standard underlying the logo liability doctrine continues to be good law in the Eighth Circuit in the wake of the 1992 amendments to the federal motor carrier safety regulations.   Under either standard, Mr. DeProw is a statutory employee of Rapid Response 1, LLC for purposes of the federal motor carrier safety regulations, and Rapid Response 1, LLC is liable for Mr. DeProw's negligent acts.[5]

---

[5]The court is persuaded by the Ninth Circuit's reasoning in Zamalloa in which the court held that 49 C.F.R. § 1057.12(c)(1)—now 19 C.F.R. § 376.12(c)(1)—did not preclude a driver from having more than one statutory employer where the statutory employers were also common carriers.   31 F.3d at 914-16.

### a.     Irrebutable Presumption of Liability

Under the irrebutable presumption of liability interpretation of

§ 376.12(c)(1), Mr. DeProw qualifies as a statutory employee of Rapid Response

1, LLC, and that entity is strictly liable for injuries to the public caused by his

negligent acts while operating the leased semi.   Only two requirements must be

satisfied in order to hold a carrier-lessee liable to the public for injuries caused

by the negligent operation of a leased vehicle: (1) a valid lease must be in effect

and (2) the vehicle must display the carrier-lessee's ICC placard containing

the lessee's USDOT identification number in accordance with 49 C.F.R.

§§ 376.11(c)(1), 390.21.   Wellman, 496 F.2d at 136; Grinnell, 722 F.2d at 1404;

Acceptance Ins. Co., 927 F.2d at 1027; see also UPS Ground Freight, Inc., 990 F.

Supp. 2d at 856.[6]

On February 18, 2011, Rapid Response 1, LLC executed an "Independent

Contractor Vehicle Lease Agreement" with Rapid Response, Inc. in which it was

the lessee and Rapid Response, Inc. was the lessor.   (Docket 54-4 at p. 7).   This

lease was in effect on July 24, 2012, the date on which Mr. DeProw made the

prohibited U-turn which injured Andy Davis.   Id.   Paragraph B of the lease

states, "[i]t is agreed that the control and possession of the equipment and the

---

[6]Although not specifically stated in the cited cases, the court included the
requirement that a valid lease be in effect at the time of the negligent conduct to
account for situations where the lease had expired and the driver improperly
continued to operate the vehicle while displaying the carrier-lessee's USDOT
number.

responsibility therefor shall be exclusively the lessee's for the full period of this lease." Id.  Paragraph C of the lease states, "[i]t is agreed that the equipment shall not be used during the period of this lease for any purpose other than as directed by the lessee in the pursuance of its services to the public." Id. at 8.

Rapid Response 1, LLC and Rapid Response, Inc. entered into a lease in accord with 49 C.F.R. §§ 376.11(a) and 376.12.   Additionally, the court finds the lease complies with 49 C.F.R. § 376.12(c)(1), as paragraph B vests Rapid Response 1, LLC with exclusive possession and control of the equipment and paragraph C vests Rapid Response 1, LLC with exclusive control of how the equipment is used during the term of the lease.   Thus, a lease agreement in compliance with the federal motor safety regulations existed between Rapid Response 1, LLC and Rapid Response, Inc. at the time Mr. DeProw injured Andy Davis.

The undisputed facts show that the semi driven by Mr. DeProw displayed a placard containing Rapid Response 1, LLC's USDOT identification number of 1643875 at the time of the incident.   (Dockets 54-4 at p. 5, 55).   The evidence also indicates, and Rapid Response 1, LLC does not assert otherwise, that Andy Davis was a member of the traveling public at the time of his collision with Mr. DeProw.   Therefore, if the irrebutable presumption standard is applied to the facts of this case, Mr. Davis has shown that Mr. DeProw was a statutory employee of Rapid Response 1, LLC.   As a result, Rapid Response 1, LLC is

liable for all damages sustained by plaintiffs as a result cause of the traumatic brain injury suffered by Andy Davis.

### b.    Rebuttable Presumption of Liability

Rapid Response 1, LLC also failed to adduce any evidence rebutting the presumption Mr. DeProw was an agent of Rapid Response 1, LLC.   Because the court already determined Mr. DeProw was a statutory employee of Rapid Response 1, LLC under the federal motor carrier safety regulations, the court need only determine if Rapid Response 1, LLC provided sufficient evidence to rebut the presumed agency relationship between itself and Mr. DeProw.[7]   Rapid Response 1, LLC failed to satisfy its burden.   Indeed, Rapid Response 1, LLC entirely failed to respond to plaintiff's motion for partial summary judgment.

Rapid Response 1, LLC and Rapid Response, Inc. entered into a lease agreement which gave Rapid Response 1, LLC exclusive possession, control and usage of the leased equipment.   (Dockets 54-4 at pp. 7-9, 54-5 at p. 2) (The deposition of David Plumley, the corporate designee of Rapid Response 1, LLC and Rapid Response, Inc.).   However, Rapid Response 1, LLC ceded its operating authority to Rapid Response, Inc.   (Docket 54-4 at pp. 8-9).   Rapid Response 1, LLC placed no limits on Rapid Response, Inc.'s usage of its operating authority

---

[7]The court applies the same analysis in determining whether Mr. DeProw was a statutory employee for purposes of the federal motor carrier safety regulations under both the irrebutable presumption of liability standard and the rebuttable presumption of liability standard.   The only difference is that under the rebuttable presumption of liability approach Rapid Response 1, LLC is given an opportunity to rebut the presumed agency relationship between itself and Mr. DeProw.

on either the leased equipment or on the operations of its drivers, including Mr. DeProw.   Id.   Mr. Plumley testified that Rapid Response, Inc. did not compensate Rapid Response 1, LLC for this privilege.   Id. at 9; see also Docket 54-6 at p. 3.

Rapid Response 1, LLC entirely relied on Rapid Response, Inc. to hire, supervise, pay and manage Mr. DeProw.   Id. at 4-5.   Rapid Response 1, LLC had only two employees—both of whom were truck drivers.   (Docket 54-6 at p. 2).   Rapid Response 1, LLC's drivers received oversight from a safety director, Deana Vanderwall.   Id.   Ms. Vanderwall was employed by Rapid Response, Inc. but acted as the safety director for both Rapid Response 1, LLC and Rapid Response, Inc.   (Dockets 54-4 at pp. 2-3, 54-6 at p. 2).   Rapid Response 1, LLC did not have its own general manager.   (Docket 54-4 at p. 2).

Rapid Response 1, LLC cannot avoid the presumption of an agency relationship between itself and Mr. DeProw by simply granting Rapid Response, Inc. unfettered control of its semi-tractors, trailers and drivers.   To allow as much would be violative of the congressional intent supporting the 1956 amendment of the Interstate Common Carrier Act.   Bays, 691 F. Supp. 2d at 730 (The Interstate Common Carrier Act was amended "to protect the public from the tortious conduct of the often judgment-proof truck-lessor operators . . . [by] . . . requir[ing] interstate motor carriers to assume full direction and control of the vehicles as if they were the owners of such vehicles.") (citations and internal quotation marks omitted).   Rapid Response 1, LLC is an operational

20

arm of Rapid Response, Inc. and although it did not act on its exclusive right to possess, control and use the leased equipment, the law requires its responsibility for the actions of Mr. DeProw to be determined by applying the terms of the vehicle lease agreement it signed with Rapid Response, Inc.   Rapid Response 1, LLC failed to rebut the presumption of an agency relationship with its driver. The court presumes an agency relationship between Rapid Response 1, LLC and Mr. DeProw.

### c.   South Dakota Agency Law

An agency relationship exists between Rapid Response 1, LLC and Mr. DeProw through the application of South Dakota agency law.   "Agency is the representation of one called the principal by another called the agent in dealing with third persons."   SDCL § 59-1-1.   "[A] principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as part of the transaction of such business."   SDCL § 59-6-9.   "The liability of an employer for the tortious acts of his employee rests upon the doctrine [of] *respondeat superior*. . . . [which states] . . . that an employer is not liable for an act or omission of an employee that is not within the *scope of his employment*."   Antonen v. Swanson, 48 N.W.2d 161, 167 (S.D. 1951) (citations omitted) (emphasis added); see also Gruhlke v. Sioux Empire Fed. Credit Union, Inc., 756 N.W.2d 399, 406 (S.D. 2008) ("[W]hen employees act within the scope of their employment, their acts are the acts of their company.").

21

The South Dakota Supreme Court has had several occasions to consider and refine its definition of "scope of employment."   The Court characterized "within the scope of employment" as a "vague but flexible [standard], referring to 'those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods . . . of carrying out the objectives of the employment.' "   Deuchar v. Foland Ranch, Inc., 410 N.W.2d 177, 180 (S.D. 1987) (quoting Prosser and Keeton on the Law of Torts § 70, at 502 (5th ed. W. Keeton 1984)).

In 1986, the Court adopted a "foreseeability" test to determine whether an agent's acts were within the scope of employment:

> We think it fairly stated that a principal is liable for tortious harm caused by an agent where a nexus sufficient to make the harm foreseeable exists between the agent's employment and the activity which actually caused the injury; foreseeable is used in the sense that the employee's conduct must not be so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business.

Leafgreen v. American Family Mutual Insurance Co., 393 N.W.2d 275, 280-81 (S.D. 1986).

" 'Foreseeability' as used in the *respondeat superior* context is different from 'foreseeability' as used for proximate causation analysis in tort law. . . . In *respondeat superior*, foreseeability includes a range of conduct which is fairly regarded as typical of or broadly incidental to the enterprise undertaken by the employer."   Kirlin v. Halverson, 758 N.W.2d 436, 444 (S.D. 2008) (citations and internal quotation marks omitted, emphasis in original).   Typically, " 'whether

22

the act of a servant was within the scope of employment must, *in most cases*, be a question of fact for the jury.' " Id. at 445 (quoting Deuchar, 410 N.W.2d at 181) (emphasis added).

The Court has endorsed the consideration of numerous factors when determining whether an agent's actions were foreseeable. See, e.g., Deuchar, 410 N.W.2d at 181 ("Were the servant's acts in furtherance of his employment? If the answer is yes, then employer liability may exist even if his servant's conduct was expressly forbidden by the master."); Leafgreen, 393 N.W.2d at 280-81 (The court considered whether a benefit ran to the principal, whether the agent's actions were remote in time from the principal's involvement with the victim, whether the agent's opportunity to commit the tortious act arose outside of his employment with the principal, and whether imposing liability on the principal would be "unfair."); Kirlin v. Halverson, 758 N.W.2d at 445 (quoting Rodgers v. Kemper Constr. Co., 50 Cal. App. 3d 608, 622-23 (Ct. App. 1975) (The Court considered whether the agent's conduct "was [a] manifest[] . . . outgrowth of the employment relationship [which resulted in] a risk which may fairly be considered as typical of, or incidental to, the employment.); see generally Restatement (Second) of Agency: Use of Force § 245 (1958).

In this case, it is undisputed that Rapid Response 1, LLC ceded all of its operating authority under the lease to Rapid Response, Inc.   (Dockets 54-4 at pp. 8-9).   It is also undisputed that while Mr. DeProw was driving to Belle Fourche, South Dakota, to pick up a cargo load from American Colloid, he was

operating within the scope of his employment as agreed by Rapid Response 1, LLC to Rapid Response, Inc. in the vehicle lease agreement.   (Dockets 36 at ¶¶ 42-43; 41 at ¶¶ 21-22; 52 at p. 1).   Mr. DeProw's trip was done under the direction and supervision and with the permission of Rapid Response, Inc. (Dockets 54-4 at p. 6).   In light of the undisputed facts of this case, the court finds it was foreseeable that Mr. DeProw, a truck driver, would perform a prohibited U-turn while driving his semi.   Therefore, Mr. DeProw was acting within the scope of his employment when he injured Andy Davis.   Under the rebuttable presumption of liability standard, Rapid Response 1, LLC is liable for all damages sustained by plaintiffs as a result of the traumatic brain injury suffered by Andy Davis.

## ORDER

Based on the above analysis, it is hereby

ORDERED that plaintiffs' motion for partial summary judgment on the issues of liability and causation (Docket 51) is granted.

Dated January 23, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

24